State ex rel. Rose vs. Superior Court of Milwaukee County.

THE STATE EX REL. ROSE, Mayor, and others vs. THE SUPE-RIOR COURT OF MILWAUKEE COUNTY and another.

*February 2 — February 27, 1900.*

*Municipal corporations: Common council: Ordinances: Franchises: Injunctions: Violation: Contempt of court: Legislative power: Jurisdiction: Equity: Prohibition.*

1. During the pendency before the common council of an ordinance to grant certain franchises for the use of certain streets to a street railway corporation and to extend certain similar franchises then existing, on a duly verified complaint, an injunction was issued requiring the mayor and common council to refrain from acting thereon until a hearing could be had. On the hearing before the trial court it appeared that, notwithstanding such injunction, the common council had passed and the mayor had approved the ordinance in question. Thereupon proceedings were taken before the trial court to punish, as for a criminal contempt, members of the common council who had voted for such ordinance, and the mayor, for violating such injunction. *Held,* that, in determining the question whether the common council, in passing the ordinance, acted within its prescribed limits as a legislative body, the trial court was confined to the facts alleged in such complaint, which, upon the hearing on the question of contempt, must be taken as true; and that sec. 1862, Stats. 1898 (providing that municipal authorities may grant to a street-railway corporation the use, "upon such terms as the proper authorities shall determine," of any streets for tracks, such corporation to be subject to such rules, regulations, and license fees as the proper municipal authorities may by ordinance, from time to time, prescribe), conferred upon the common council power and authority, legislative in its character, to pass said ordinance; hence the court was without jurisdiction to enjoin its passage.

2. In considering the acts of a municipal corporation, legislative in their character, the court is limited to the question of power, and its inquiry does not extend to matters of expediency, the motives of the legislators, or the reasons given for their action; hence a court of equity cannot properly interfere with, or restrain in advance, the discretion of the municipal body while it is exercising such legislative powers.

3. A court of equity cannot enjoin the passage of an ordinance by a municipal corporation merely because the mode or manner of its procedure is irregular.

State ex rel. Rose vs. Superior Court of Milwaukee County.

PROHIBITION to the Superior Court of Milwaukee county and to J. C. LUDWIG, judge thereof. *Peremptory writ granted.*

On January 18, 1900, there were filed in this court three verified petitions,— one by *David S. Rose*, mayor of the city of Milwaukee; another by *Edward M. Schuengel*, clerk of the city of Milwaukee; and another by *Cornelius Corcoran* and twenty-two others, therein named, being twenty-three in number, and a majority of the forty-two aldermen of that city. Each of such petitions prayed that a writ of prohibition issue from this court to the *Superior Court of Milwaukee County* and to the *Honorable John C. Ludwig*, judge thereof, restraining him and it from proceeding in the contempt proceedings therein mentioned, and from passing any sentence therein against the petitioners, respectively, and from imposing any fine upon them, and from restraining them, respectively, of their liberty, and from in any way punishing any of them for the cause therein stated. On the same day such writ was issued from this court, restraining said court and judge as so prayed, until February 2, 1900, and until the further order of this court, and requiring that, on the day last named, that court and the judge thereof show cause before this court why they should not be absolutely restrained and prohibited from any further proceedings in such contempt proceeding and matter.

On January 27, 1900, *Honorable John C. Ludwig*, as such judge of the superior court of Milwaukee county, made and filed in this court due return under the seal of that court to such writ to the effect that such writ had been and was being obeyed; that December 21, 1899, one H. A. Schwartzburg began an action in that court against the mayor, clerk, and the forty-two members of the common council of the city of Milwaukee, and other persons and corporations named in the summons and complaint therein mentioned, and a true copy of which was therewith returned, and procured therein an injunctional order, a true copy of which was thereunto annexed and therewith returned, upon the veri-

fied complaint and the undertaking, a true copy of which
was annexed and therewith returned, and which summons,
complaint, undertaking, and injunctional order were duly
served on all of such defendants therein; that after such
service certain of such defendants violated and set at naught
such injunctional order, as shown by their admissions and
answer; that thereafter, upon motion by such defendants
to vacate such injunctional order before that court, and
upon the hearing of that motion, the disregard and violation
of such injunctional order was brought to the notice of that
court, whereupon that court made and caused to be served
the order to show cause, a true copy of which was thereunto
annexed and therewith returned; that the same was duly
served on all of such defendants accused of violation of such
injunctional order, except Caufy; that such accused per-
sons appeared in answer to the order to show cause, where-
upon specific charges were filed against each, true copies of
which charges were thereunto annexed and therewith re-
turned; that thereupon such defendants, being personally
present, and by their counsel, offered, in answer to the
charges, their return to the order to show cause, and asked
to have the same stand as an answer or demurrer to such
charges; that the court, having heard arguments thereon at
great length, at the conclusion of such arguments, made and
filed the decision in writing, a true copy of which was there-
unto annexed and therewith returned; and that such pro-
ceedings in that court went no further than the decision and
determination as set forth in such written opinion up to the
time the writ herein was served upon him, and he thereby
certified to this court, in obedience to such writ, and with
such writ, the annexed, which were true, correct, and com-
plete copies of all the proceedings aforesaid, and all the
papers in such contempt proceedings, and that copies were
returned instead of the original for the reason that the de-
fendants so charged, by their attorneys, insisted on proceed-

ing with the motion to vacate such injunction while the matters relating to such contempt were in progress in this court under the writ aforesaid.

Upon the hearing in this court, February 2, 1900, such relators severally demurred to such return.

In the complaint of H. A. Schwartzburg, so mentioned in such return, it is alleged, in effect, that he is and was at all times therein mentioned a resident, citizen, elector, and taxpayer in the city of Milwaukee, and as such brought that suit in his own behalf and in behalf of all other taxpayers of the city similarly situated; that the defendant *David S. Rose* is the duly elected, qualified, and acting mayor of that city; that the defendant *E. M. Schuengel* is city clerk of that city; and that the defendants therein named, being forty-two in number, are the duly elected, acting, and qualified aldermen constituting the common council of that city; that the defendant the Milwaukee Electric Railway & Light Company is a stock corporation organized and incorporated under the laws of Wisconsin, and engaged in the business of running and operating the city railway by electric power in the streets of Milwaukee, and also making and disposing of for money, to the city and to other persons, electric light and power; that the defendant Henry C. Payne is a resident in Milwaukee, and the vice president of such railway and light company, and the defendant Charles F. Pfister is one of the directors thereof; that all of the other officers and directors of the railway and light company reside outside of this state, except one Bigelow; that the city of Milwaukee is now, and has been for many years last past, the owner of and entitled by law to grant, sell, or dispose of for money the right to use its streets for street-railway purposes and the transportation of passengers under and pursuant to the charter of the city and the laws of the state; that the city, in its corporate capacity, and as trustee for the public, owns and has the right to grant to any per-

son or corporation the use of its streets, or any part thereof, for the carriage and transportation of passengers for hire or compensation, and to fix the rate of such compensation to be charged by such grantee, and that such right is of great value, to wit, for all streets available for such purposes, $3,000,000; that there are sixteen miles in length of streets therein referred to upon which no right has been heretofore granted to the railway and light company; that that company has, or claims to have, certain licenses or rights under ordinances of the city to use most of the streets of the city available for street-railway purposes for a limited period, which, by the terms of such ordinances, has not yet expired; that the railway and light company and the mayor of the city and certain other defendants who are members of the common council, unknown to the plaintiff, soon after their election, colluded and conspired together for the purpose of obtaining for the railway and light company, as a gratuity from the city, valuable rights, licenses, and franchises to use its streets for street-railway purposes on all principal streets of the city not theretofore held by the railway and light company for such purposes, and an extension of its existing licenses or franchises for the purpose of preventing the common council, in the exercise of its just powers in the future, from regulating the rate of fare to be charged by the railway and light company, and for the purpose of extending existing licenses or franchises to use such streets, and so heading off any future common council or mayor from acting thereon; and, for the purpose of carrying out such conspiracy, the mayor opened up and carried on correspondence with the officers of the railway and light company, and held interviews and had meetings with such officers at various times between April 10, 1898, and November 20, 1898; that in pursuance of such conspiracy and combination the railway and light company, November 4, 1898, offered to the mayor, and through him to the city, that, in case the city

would grant the railway and light company the right to charge five cents for each single fare for each passenger, with one transfer for each fare paid, and the right to lay tracks and operate its street railways over certain streets in the city not then covered by such street railway or any of its franchises, the railway and light company would pay to the city, in lieu of a reduction of fares, January 1, 1899, $50,000, January 1, 1900, $60,000, January 1, 1901, $70,000, January 1, 1902, $80,000, January 1, 1903, $90,000, January 1, 1904, $100,000, and $100,000 annually thereafter, and, in addition, whenever the profits earned by the railway and light company should pay a dividend of six per cent. per annum on its stock to its stockholders, that then and from thenceforth there should be paid to the city one third of all annual profits above six per cent. in addition to the $100,000 per annum, and that such payments were to be independent of and in addition to all taxes, assessments, license fees, or charges exacted from the railway and light company under any law of this state; that such communication, with other correspondence between the mayor and the officers of the railway and light company, was made public November 20, 1898; that thereupon the electors and taxpayers of the city assembled in several mass meetings, and protested against the sale of such licenses or franchises, or the extension thereof, or the sale of the right of the city to regulate the fare charged by the railway and light company; that such offer was not accepted, but the proceedings thereon were allowed to lapse and be abandoned; that thereafter the mayor and certain of the members of the common council and the railway and light company and its officers renewed and continued their efforts in pursuance of the unlawful combination and conspiracy aforesaid, to procure for the railway and light company, without any compensation to the city, the valuable rights, privileges, licenses, and franchises aforesaid, and held various conferences and meetings at divers

places and on different dates for the purpose of obtaining from the city, through the collusion and connivance of the mayor, the valuable rights, licenses, and franchises aforesaid, and thereafter, and in pursuance of such combination and conspiracy, the railway and light company caused to be prepared and submitted to the common council an ordinance thereunto annexed, to which the amendment thereunto annexed and made part thereof was, December 18, 1899, made and passed to a third reading by the common council; that the only compensation or payment to the city for such grant in such ordinance contained was that the railway and light company would sell, to be used during certain hours in each day, twenty-five tickets for $1, or six tickets for twenty-five cents, each of which tickets should entitle the holder thereof to use the same upon the cars of the railway and light company only between the hours of 5:30 o'clock and 7:30 o'clock in the morning, and between the hours of 5 o'clock and 6:30 o'clock, central standard time, in the afternoon of each day, until January 1, 1905, and thereafter to continue the sale of tickets in packages at the prices aforesaid until December 31, 1934, each to be good at all hours of the day, with the same privileges as are or may be accorded to the passengers paying a single cash fare of five cents.

Said complaint further alleged that the mayor, Henry C. Payne, Charles F. Pfister, and certain of such aldermen and various agents of theirs throughout the city, at their instigation and direction, falsely gave out, held forth, and pretended that under the existing ordinance possessed by the railway and light company that company had an absolute right to charge five cents for each fare, and that such right was beyond the power of the common council to regulate, and that in return for the concession on the part of the railway and light company to the city of a power which the city amply possessed at all times therein mentioned, the city should and ought to grant the railway and light com-

pany not only an extension for all its existing licenses or
franchises for a period of ten years after 1924, but also the
right to charge an absolute fare of five cents for each pas-
senger, except as modified through purchases of tickets in
quantities aforesaid, and to the extent aforesaid, and that
additional licenses or franchises to use about sixteen miles
of the streets of the city described, shutting out all possible
competition, should be given gratuitously to the railway
and light company; that the railway and light company
and its officers and the mayor and certain of such aldermen
colluded and conspired together in pursuance of the plan,
scheme, or conspiracy aforesaid to procure the grant and
licenses to use such streets, fixing the rates aforesaid, and
extending the period of existing licenses as aforesaid, in the
form of a contract, instead of in the form of legislation, so
that such ordinance should be first apparently proposed by
the city subject to the acceptance of the railway and light
company, and that thereafter the railway and light com-
pany should accept the same in writing, and make the pre-
tended concessions aforesaid, and extend its lines upon the
sixteen miles of new streets, and so obtain in the form of
an ordinance a contract, which could not be thereafter im-
paired, either by the state legislature or by the common
council, and that such was the purpose of the railway and
light company and its officers, aided by the mayor and cer-
tain members of the common council, and for such purposes
the ordinance in question was passed; that under the exist-
ing ordinances the railway and light company has no abso-
lute right to charge a fare of five cents, but only a fare not
to exceed five cents, for each passenger, subject to the regu-
lations by the common council, and has no right to use any
of the streets longer than 1924, except at the will or pleas-
ure of the common council, and has no authority or right
whatever on the new streets mentioned, nor to withhold
transfer tickets, but are in all such matters subject to the

reasonable regulations of the common council; that the railway and light company and its officers and the mayor and certain of the aldermen, in pursuance of such fraudulent and collusive scheme to give away the valuable property or rights aforesaid of the city to the railway and light company, are negotiating and dealing together, and pretending to represent the city for the purpose of making proposed ordinances, not an ordinary legislative measure or *quasi* contract, like a charter, but an absolute contract based upon a compromise as a valuable consideration; that the vice president of the railway and light company, acting for and on behalf of that company, for the express purpose of obtaining such ordinance, and of silencing opposition to the same, and obtaining support of the aldermen who represented their wards, entered into an agreement with such citizens therein whereby he and that company assumed and agreed to pay such citizens $8,500 in case of the passage of such ordinance, and thereby induced many of such aldermen to vote for such ordinance; that the mayor and common council have no legal right, power, or authority to make any such contract with the railway and light company, nor to give away or donate any of the property or rights, licenses, or franchises which the common council might, by law, have authority to grant or confer without a valuable consideration when it is possible to obtain a valuable consideration therefor; that the pretended consideration or compromise is wholly inadequate and insufficient to pay for the rights granted by such ordinance and the amendment thereto over and above what the railway and light company already enjoys; that the rights granted by such ordinance and the amendment thereto, over and above and beyond those owned or enjoyed by the company under existing ordinances, are worth more than $1,000,000; that December 18, 1899, one Cassius M. Payne offered, in writing, to the city, $100,000 in cash for all the additional rights, licenses,

and franchises over and above what it now possesses, proposed to be granted to the railway and light company by such ordinance, and accompanied such offer with a tender of a certified check to the city for $25,000 as earnest of good faith and part payment; that Cassius M. Payne was able, ready, and willing to pay $100,000 to the city for such rights, privileges, and franchises last mentioned, and is still able, ready, and willing to pay such sum of $100,000 for the purpose aforesaid, which offer the city and its officers refused, and still refuse, to accept, or any other sum for such rights, privileges, and franchises, but intend by means of the collusion and conspiracy aforesaid to give the same as a gratuity to the railway and light company; that the proposed ordinance was reported to the common council for passage as a new or substitute ordinance by the majority of a special committee to which the same was referred December 4, 1899, accompanied by the minority report calling attention to its evils and injustice, and the inadequacy of consideration therefor; that December 18, 1899, such ordinance came before the common council for passage upon the majority and minority report of the special committee.

Said complaint also alleged that, notwithstanding the several facts mentioned, the common council, December 18, 1899, after passing the amendment thereunto annexed, by a vote of twenty-five in favor of such amendment to seventeen against it, in the manner therein set forth, and in pursuance of the agreement, combination, and conspiracy therein mentioned, passed such ordinance as amended, and ordered it engrossed, and that such ordinance is now in the hands of the city clerk and of the engrossing committee of the common council, and the same will be engrossed, ordered to a third reading, and passed at the next meeting of the common council, to be held within a few days, and will then be accepted by the railway and light company, and thereafter enforced by the city, to the great loss and dam-

age of the plaintiff and all those similarly situated; that the
twenty-five members of the council so voting for such ordi-
nance, being defendants named therein, colluded and con-
spired together with the mayor and Payne and Pfister to
obtain such valuable rights and franchises for the railway
and light company gratuitously or for the alleged consid-
eration mentioned, and held various conferences prior to
December 18, 1899, in secret, and rehearsed the proceed-
ings which they would take at such meeting, and agreed
together as to the mode of proceeding; that the minority
of the common council called the attention of that body to
the fact that they could not understand the legal effect of
the amendment, and moved that the amendment be referred
to the judiciary committee, but the same was voted down
by the twenty-five members of the common council last
named, and the amendment has never been referred to or
considered by any committee of the common council; that
at the meeting of December 18, 1899, the chairman of the
common council instructed the twenty-five members how to
vote, and the effect of their voting on certain motions; that
the twenty-five alderman so named prevented all efforts at
adjournment, refused to go into committee of the whole,
and rushed the measure through the common council with-
out deliberation, and with indecent haste, and without con-
sideration; that, in pursuance of such collusion and con-
spiracy, the twenty-five members of the council last named,
prior to the meeting of December 18, 1899, agreed together
that no amendment to such ordinance proposed by any one
except one of their number named should be considered or
permitted to pass, and that no amendment thereto should
be referred to the judiciary committee, and that such report
of the minority should not be adopted or approved; that at
the meeting of December 18, 1899, the twenty-five alder-
men therein named carried out in voting and passing upon
such ordinance their agreements in aid of and pursuant

to such conspiracy; that under the proposed ordinance as originally written, and also under the same as amended, the city acquires no rights that it did not theretofore possess under existing franchises, charter, and ordinances, and receives no consideration whatever; that no consideration accrued to the city or the taxpayers thereof; that, in furtherance of such conspiracy, Pfister, for the purpose of buying off opposition to the proposed ordinance and obtaining support of certain aldermen, entered into an agreement in writing December 18, 1899, prior to the vote on such ordinance, with a certain person therein named, and others unknown to the plaintiff, to the effect that he would be personally liable to pay about $9,000, or not to exceed $9,000, in case the proposed ordinance passed the common council and was accepted by the railway and light company, which offer was accepted, and their opposition to such ordinance by reason thereof withdrawn; that by reason of the facts alleged the money, rights, privileges, and franchises mentioned were lost to the city, and squandered, and the plaintiff's burdens of taxation correspondingly increased, the burdens of taxation of all other taxpayers in the city in similar condition to the plaintiff are correspondingly increased by such unlawful waste and squandering of the salable, valuable rights and property of the city; that the railway and light company has issued $7,000,000 in negotiable, corporate bonds, secured by a mortgage on its right of way, cars, apparatus, and property, including such rights and franchises, and all other rights and franchises which it may acquire from the common council, and may issue still other bonds, all of which may go into the hands of *bona fide* holders for value, and hence become enforceable; that the common council and city clerk threaten and intend to engross and pass such ordinance or contract by a majority vote of all its members, and give out that they are about to do so, and the mayor of the city threatens and intends to approve the same, and

gives out that he will do so, and the railway and light company threatens and intends to immediately accept the same, and file or tender a relinquishment of such pretended rights as they claim to be the consideration of such contract.

Plaintiff asked that a full discovery be had, and that said defendants be required to make answers in that behalf, and, when such facts are. discovered, the same be added by amendment to such complaint; and averred that he has no adequate remedy at law, and that, unless that court grant to him its injunctional order or writ of injunction, he and his fellow taxpayers will be without remedy.

Wherefore the plaintiff asked that the defendants therein be each and all enjoined and restrained from passing such ordinance.

Upon such verified complaint and the undertaking thereunto annexed, the court commissioner, on December 21, 1899, ordered that the city, the mayor, the city clerk, and each and every of the defendants named therein as aldermen of the city, be, and they were thereby, enjoined and restrained until the further order of that court from signing, engrossing, passing, amending, voting on, publishing, approving, or enforcing such proposed ordinance, as amended, or any similar ordinance, and from contracting away any rights of the city, by ordinance or otherwise, to the railway and light company, under such proceedings, and that the railway and light company, Pfister, and Payne, each and all of them, were thereby enjoined and restrained from accepting the ordinance as amended, or any similar ordinance, and from attempting to purchase from the city, except by open competition, and upon due notice, and upon adequate consideration, any rights, privileges, or franchises to use the streets of the city.

Upon the hearing in the trial court of the several orders to show cause why the injunction so issued by such court commissioner December 21, 1899, should not be vacated and

set aside, it having appeared to the judge of such court in open court by affidavits filed and read in opposition to such motions, and by statements of one of the attorneys and counsel for some of the aldermen defendants and by one of the attorneys and counsel for the mayor, that, notwithstanding the injunctional order therein named and served upon the defendants, the mayor signed and approved the ordinance January 2, 1900, and the city clerk signed such ordinance, and the president of the common council signed and approved such ordinance, and the twenty-four aldermen therein named as defendants voted on, passed, and approved such proposed ordinance, and that all and singular the acts afore-said of the defendants in violation of such injunction were done at the city of Milwaukee January 2, 1900; therefore, the trial court, of its own motion, suspended the hearing upon such several orders to show cause why the injunction should not be vacated and set aside, and on January 5, 1900, ordered that each and every one of the aforesaid defendants, who, as it is claimed, violated such injunctional order, show cause before that court why he should not purge himself of his alleged contempt, or why, in default of his being able so to do, he should not be punished as for a contempt of that court, in the manner and to the extent allowed by law; that a copy of that order to show cause should be served on each of the defendants named in the body of the order on or before 9 o'clock a. m. of January 5, 1900; and it was therein further ordered that each and every one of the defendants named in the body of that order as having violated such injunction show cause, as aforesaid, before that court on January 5, 1900, at 10 o'clock a. m. of that day, or as soon thereafter as counsel could be heard, and that specific charges be then and there filed under oath against and served upon each of such defendants named in the body of that order.

Such order to show cause having been duly served, the trial court, upon the hearing thereof, adjudged that it had

jurisdiction, and hence granted the order to show cause, and adjudged that the mayor, clerk, and the majority of the common council named were guilty of the contempt of that court in violating such injunctional order.

For the relators there were separate briefs signed by *Charles Quarles*, attorney, and *Miller, Noyes, Miller & Wahl*, of counsel, for *Rose;* a brief by *Ryan, Ogden & Bottum* for *Corcoran* and others; and the cause was argued orally by *Mr. Quarles, Geo. P. Miller, Hugh Ryan*, and *J. G. Flanders*. They contended, *inter alia*, that the act in question was legislative in its nature, notwithstanding a contract arises therefrom, and hence beyond the power of a court of equity to interfere therewith. *Green Bay v. Brauns*, 50 Wis. 204; *Wright v. Milwaukee E. R. & L. Co.* 95 Wis. 29–36; *State ex rel. Att'y Gen. v. Madison St. R. Co.* 72 Wis. 612–617; *State ex rel. Cream City R. Co. v. Hilbert*, 72 Wis. 184; *State ex rel. Milwaukee St. R. Co. v. Anderson*, 90 Wis. 565; *Stedman v. Berlin*, 97 Wis. 505; Booth, Street Railway Law, § 12; Elliott, Roads & S. 562, 563; *Tilley v. S., F. & W. R. Co.* 5 Fed. Rep. 657; *St. Louis v. Western Union Tel. Co.* 148 U. S. 103; *New Orleans v. Great Southern T. & T. Co.* 40 La. Ann. 41; *Belleville v. Citizens H. R. Co.* 152 Ill. 186; *Chicago M. G. L. Co. v. Lake*, 130 Ill. 42; *Baltimore T. & G. Co. v. Baltimore*, 64 Fed. Rep. 160; *City Railway Co. v. Citizens Railroad Co.* 166 U. S. 566; *Des Moines G. Co. v Des Moines*, 44 Iowa, 505–509; *Walla Walla v. Walla Walla W. Co.* 172 U. S. 1–9; *Montgomery G. L. Co. v. Montgomery*, 4 L. R. A. 616, 621; *Kittinger v. Buffalo T. Co.* 160 N. Y. 377; *Hayes v. M. C. R. Co.* 111 U. S. 237; *Wabash R. Co. v. Defiance*, 167 U. S. 97; *Att'y Gen. ex rel. Taylor v. Brown*, 1 Wis. 513–522; *Mississippi v. Johnson*, 4 Wall. 500; *Green v. Mills*, 25 U. S. App. 383; *Angle v. C., St. P., M. & O. R. Co.* 151 U. S. 1; *Cincinnati St. R. Co. v. Smith*, 29 Ohio St. 306; *Cape May & S. L. R. Co. v. Cape May*, 35 N. J. Eq. 419–421; *Alpers v. San Francisco*, 32 Fed. Rep. 503; *People ex rel. Davis v.*

*Sturtevant,* 9 N. Y. 263; *Roberts v. Louisville,* 92 Ky. 95; *Trading S. Co. v. Memphis,* 101 Tenn. 181; *Paterson & P. H. R. Co. v. Paterson,* 24 N. J. Eq. 159; *Davis v. Mayor, etc. of N. Y.* 1 Duer, 452; 1 Dillon, Mun. Corp. (4th ed.), § 308; 2 High, Inj. (3d ed.), § 1246; Cooley, Const. Lim. 221, note; *People ex rel. Bolton v. Albertson,* 55 N. Y. 50; *People ex rel. McLean v. Flagg,* 46 N. Y. 401; *Baird v. Mayor, etc. of N. Y.* 96 N. Y. 567; *Waterloo W. Mfg. Co. v. Shanahan,* 128 N. Y. 345.; *Pedrick v. Ripon,* 73 Wis. 622; *Taylor v. Carondelet,* 22 Mo. 105; *Heland v. Lowell,* 3 Allen, 407; *State ex rel. Att'y Gen. v. Cunningham,* 81 Wis. 440; *Crescent City L. S. L. & S. H. Co. v. Jefferson Police Jury,* 32 La. Ann. 1192. The city of Milwaukee is not authorized by its charter to grant street railroad franchises. Sec. 1862, Stats. 1898, alone authorizes such grants. *Davis v. Mayor, etc. of N. Y.* 14 N. Y. 507; *Ashland v. Wheeler,* 88 Wis. 615; *State ex rel. Cream City R. Co. v. Hilbert,* 72 Wis. 190; *Milwaukee E. R. & L. Co. v. Milwaukee,* 95 Wis. 41; *State ex rel. Att'y Gen. v. Janesville W. P. Co.* 92 Wis. 496. If the court was without jurisdiction the disregard of the injunctional order constituted no contempt. *Dickey v. Reed,* 78 Ill. 261; *Weber v. Weber,* 90 Wis. 467; *In re Sawyer,* 124 U. S. 200; *In re Ayers,* 123 U. S. 443.

For the respondents there was a brief by *Timlin, Glicksman & Conway* and *Toohey & Gilmore,* and oral argument by *W. H. Timlin* and *John Toohey.* To the point that, when a municipal council acts or is about to act illegally, that is, beyond the powers conferred on it by law, it is amenable to the power of the courts and the courts have jurisdiction to annul, direct, or restrain the unlawful acts of such body, they cited 1 Pomeroy, Eq. Jur. §§ 1. 129–131; *In re Rosenberg,* 90 Wis. 581, 584; *People ex rel. Davis v. Sturtevant,* 9 N. Y. 263, 278; *State ex rel. Gill v. Watertown,* 9 Wis. 254; *State ex rel. Anderton v. Kempf,* 69 Wis. 470; *Earles v. Wells,* 94 Wis. 285; *Land, L. & L. Co. v. McIntyre,* 100 Wis. 256; *Webster*

*v. Douglas Co.* 102 Wis. 181; sec. 1, subch. I, ch. 184, Laws of 1874; *State ex rel. M., T. & W. R. Co. v. Tomahawk,* 96 Wis. 73; *Port of Mobile v. L. & N. R. Co.* 84 Ala. 115; *Roberts v. Louisville,* 92 Ky. 95; *Des Moines G. Co. v. Des Moines,* 44 Iowa, 505; *Stevens v. St. Mary's Training School,* 144 Ill. 336; *Paterson & P. H. R. Co. v. Mayor, etc. of Paterson,* 24 N. J. Eq. 159; *Meredith v. Sayre,* 32 N. J. Eq. 557; *Cape May & S. L. R. Co. v. Cape May,* 35 N. J. Eq. 419; *People ex rel. Negus v. Dwyer,* 90 N. Y. 402; *Davis v. Mayor, etc. of N. Y.* 1 Duer, 452, 513; *Milhau v. Sharp,* 15 Barb. 193; *S. C.* 27 N. Y. 611; *Blaschko v. Wurster,* 156 N. Y. 437; *Adamson v. Union R. Co.* 26 N. Y. Sup. 136; *Norris v. Wurster,* 48 N. Y. Sup. 656; *Gusthal v. Aldermen of New York,* 48 N. Y. Sup. 652; *Gerlach v. Brandreth,* 54 N. Y. Sup. 479; *Cincinnati St. R. Co. v. Smith,* 29 Ohio St. 291; *Page v. Allen,* 58 Pa. St. 338; *Trading S. Co. v. Memphis,* 101 Tenn. 181; *Spring Valley W. W. v. Bartlett,* 16 Fed. Rep. 615, and cases; *Alpers v. San Francisco,* 32 Fed. Rep. 503; *Murphy v. East Portland,* 42 Fed. Rep. 308; *Crampton v. Zabriskie,* 101 U. S. 601; *New Orleans W. Co. v. New Orleans,* 164 U. S. 471.

Cassoday, C. J.　The mayor, city clerk, and the twenty-three aldermen who are petitioners herein, and constituting a majority of the common council of the city of Milwaukee, frankly admitted to the trial court that they had severally violated the injunctional order in question.　The only excuse given for such violation is that the court was without jurisdiction to make such order.　The learned trial judge, in his concise opinion in the case, concedes that, if the court had no jurisdiction in the action commenced by Schwartzburg, then such order was a nullity, and there was no contempt in disobeying it.　But he contends that the court did have jurisdiction, and that, however erroneous the making of it may have been, yet that it was binding upon the defendants therein until set aside or reversed.　If the court

State ex rel. Rose vs. Superior Court of Milwaukee County.

had such jurisdiction, then the conclusion reached by the trial judge was undoubtedly correct. Thus, in a recent case, our late brother PINNEY, speaking for the court, said: "With whatever irregularities the proceeding may be affected, or however erroneously the court may have acted in granting an injunction in the first instance, it must be implicitly obeyed, as long as it remains in existence; and the fact that it has been erroneously granted affords no justification or excuse for its violation. The party against whom it issues, or who is affected by notice of its existence, will not be allowed to violate it on the ground of a want of equity in the bill, since he is not at liberty to speculate upon the intention or decision of the court, or upon the equity of the bill, or to question the authority of the court to grant relief upon the facts stated, except upon application to dissolve or vacate the injunction. Upon proceedings for contempt for violation of an injunction, the only legitimate inquiry is whether the court granting the injunction had jurisdiction of the parties and of the subject matter, and the court will not, in such proceedings, consider whether the order was erroneous. If the court had jurisdiction of the subject matter, the fact that its power was erroneously exercised does not render the injunction void, but only voidable upon proper application; and, until set aside or revoked, it is entitled to implicit obedience." *State ex rel. Fowler v. Circuit Court*, 98 Wis. 149, 150. The "wilful disobedience of any process or order lawfully issued or made" by a court having jurisdiction of the parties and subject matter is made by statute a criminal contempt. Sec. 2565, Stats. 1898. The trial judge, being convinced, as he manifestly was, that the court had such jurisdiction, could not, without stultifying his conscience, do otherwise than he did, regardless of the personality or the official positions of the defendants therein.

The important question, therefore, is whether the court did have such jurisdiction to issue that order; and that ques-

tion, as indicated by the trial judge, depends upon the question whether the common council, in passing the ordinance, acted within its prescribed limits as a legislative body.   In determining that question the trial judge properly held that he was confined to the facts alleged in Schwarzburg's complaint, which, upon such hearing on the question of contempt, were taken as true.   For that reason we have given the substance of that complaint in the foregoing statement.   It is quite lengthy, and is largely argumentative.   It alleges, in effect, that the corporate rights and franchises to operate such street railways in all the streets of the city are owned by the city; that, as such owner, the city was entitled to grant, sell, or dispose of the same for money; that such rights and franchises are of the value of $3,000,000; that one responsible man had offered in writing $100,000 in cash for the additional rights, licenses, and franchises proposed to be granted to the railway and light company, and that the same are worth $1,000,000; that the mayor and the twenty-three aldermen who are petitioners herein against the protests of the electors and taxpayers of the city, as expressed in "several mass meetings," colluded and conspired and unlawfully combined with the officers and agents of that company to grant to the railway and light company such additional corporate rights and franchises without any consideration, and as a mere gratuity, and that the company and the vice president thereof had assumed and agreed to pay certain citizens of a certain ward $8,500 in case the ordinance passed, to silence opposition thereto, and secure the support of the aldermen of such ward; that a director of the company, named, had, prior to the passage of the ordinance, agreed that, in case the ordinance passed, he would be personally liable to pay to such person and others (to the plaintiff unknown) "about $9,000, or not to exceed $9,000," for the purpose of buying off opposition and obtaining the support of certain aldermen.   Such charges were well calculated to arouse in-

dignation on the part of the people, and may have been more
or less persuasive with the representatives of the people in
the common council, but we fail to perceive their bearing
upon or relevancy to the questions of jurisdiction here pre-
sented. When, more than half a century ago, the majority
of the people of Rhode Island, under the leadership of Mr.
Dorr, attempted, without the consent of the existing state
government, to set up a new state government, and the ques-
tion of rightful authority came before the supreme court of
the United States, Mr. Webster, in his great argument, aptly
declared that: "Men cannot get together, and count them-
selves, and say they are so many hundreds and so many
thousands, and judge of their own qualifications and call
themselves the people, and set up a government." "The
power is with the people, but they cannot exercise it in
masses or *per capita*. . . . The exercise of legislative
power and the other powers of government immediately by
the people themselves is impracticable,— they must be exer-
cised by representatives of the people. . . . The basis
of this representation is suffrage. . . . Suffrage is the
delegation of the power of an individual to some agent.
. . . In the exercise of political power through represent-
atives we know nothing, we never have known anything,
but such an exercise as should take place through the pre-
scribed forms of law." 6 Webster's Works, 223–226. Simi-
lar views were manifestly entertained by Chief Justice Taney
and the court in deciding the case. *Luther v. Borden*, 7
How. 1.

The power and authority of the common council to enact
the ordinance in question is not to be determined by mass
meetings and popular assemblies, but only by the prescribed
law applicable to the case. If a director of the railway and
light company, or the vice president of that company, has
committed any crime or any unlawful act, the courts are open,
and they are liable, like other citizens, to prosecution. But

such facts, if true, are wholly immaterial on such questions: of jurisdiction, and much more so if they are untrue. The members of the common council appear to have been divided as to the wisdom of passing the proposed ordinance, and the same seems to have been true of the citizens. As frequently occurs in respect to important matters of legislation, the friends and opponents of the measure appear to have had frequent conferences and meetings, but it does not follow that such meetings, even if in secret, constituted a conspiracy. Secret caucuses are quite common in political action. They are an incident of popular government. It is not alleged that such combination was to accomplish some criminal or unlawful purpose, or to accomplish some purpose not in itself criminal or unlawful by criminal or unlawful means, unless the passage of any such ordinance was unlawful, which will be considered later. It is only necessary here to say that no alderman or officer of the city is charged with anything unlawful, unless the support and attempt to pass such ordinance was unlawful. The theory of Schwartzburg's complaint is that the corporate rights and franchises in question were owned by the city, and were held in trust for its citizens and taxpayers and the public, and that the same were the subject of barter and sale to the highest bidder. Such corporate rights and franchises in this country are special privileges conferred by the sovereign power of the state or nation, and do not belong to the citizens of the state or county by common right. At common law, such corporate rights and franchises were incapable of being seized and sold on execution. *Gue v. Tide Water C. Co.* 24 How. 263; 1 Freeman, Executions, § 179, and cases there cited; *Yellow River Imp. Co. v. Wood Co.* 81 Wis. 560, and other cases there cited. They are granted to a corporation or individuals for some specific purpose. The are, consequently, essential to the purpose, and hence cannot be separated from it without destroying the grant. Of

course, such grant can be made upon condition, or with any other restriction or limitation. Such corporate rights and franchises can only be sold, assigned, or transferred when and as authorized by statute. *Id.* See, also, *Combes v. Keyes*, 89 Wis. 311; sec. 1788, Stats. 1898, as amended by ch. 198, Laws of 1899.

This brings us to the question whether the common council had the power to pass the ordinance. No one doubts the power of the legislature to create cities, and give them the general powers possessed by municipal corporations at common law; and, in addition thereto, such powers pertaining to municipalities as may be specifically granted, as in the case of the city of Milwaukee. The statute expressly authorizes the formation of "corporations for constructing, maintaining, and operating street railways" under ch. 86, Stats. 1898, and provides that they "shall have powers and be governed accordingly." Sec. 1862. That section also expressly provides that: "Any municipal corporation or county may grant to any such corporation, under whatever law formed, or to any person who has the right to construct, maintain and operate street railways the use, *upon such terms as the proper authorities shall determine*, of any streets or bridges within its limits for the purpose of laying single or double tracks and running cars thereon for the carriage of freight and passengers, to be propelled by animals or such other power as shall be agreed on, with all the necessary curves, turnouts, switches and other conveniences. Every such road shall be constructed upon the most approved plan and be subject to such reasonable rules and regulations *and the payment of such license fees as the proper municipal authorities may by ordinance, from time to time, prescribe.* Any such grants heretofore made shall not be invalid by reason of any want of power in such municipal corporation to grant, or any such railway corporation or person to take the same; but in such respects are hereby confirmed." The authority

of the legislature to delegate to municipal corporations the
power to so grant such corporate rights and franchises can-
not be seriously doubted. In fact, this court, construing that
section, has expressly held that a municipal ordinance grant-
ing such corporate rights and franchises "has the force and
effect of a statute of the state." *State ex rel. Att'y Gen. v.
Madison St. R. Co.* 72 Wis. 612; *State ex rel. Cream City R.
Co. v. Hilbert,* 72 Wis. 184; *State ex rel. Wis. Tel. Co. v. Janes-
ville St. R. Co.* 87 Wis. 78; *Ashland v. Wheeler,* 88 Wis. 616;
*Wright v. Milwaukee E. R. & L. Co.* 95 Wis. 36. So it has
been held by the supreme court of the United States that
"the legislature may delegate to municipal assemblies the
power of enacting ordinances relating to local matters, and
such ordinances, when legally enacted, have the force of
legislative acts." *New Orleans W. W. Co. v. New Orleans,*
164 U. S. 471. To the same effect is *Des Moines G. Co. v. Des
Moines,* 44 Iowa, 505. This is in accordance with the gen-
eral rule. Thus it is stated, "Although the proposition
that the legislature of a state is alone competent to make
laws is true, yet it is also settled that it is competent for the
legislature to delegate to municipal corporations the power
to make by-laws and ordinances with appropriate sanctions,
which, when authorized, have the force, in favor of the
municipality and against persons bound thereby, of laws
passed by the legislature of the state." 1 Dillon, Mun. Corp.
(4th ed.), § 308, and cases there cited. Of course, no such
ordinance can enlarge or diminish the terms of the statute
by which the power is so delegated. Id. § 317.

It is contended that the proposed ordinance would be void
because it would impose an additional burden upon abutting
lot owners without providing for compensation. It is enough
to say that the proposed grant only covers, and could only
cover, such rights as the common council has power to grant;
it in no way purports to affect, nor could it affect, the rights
of abutting lot owners. *Paterson & P. H. R. Co. v. Pater-*

*son*, 24 N. J. Eq. 158; *Krueger v. Wis. Tel. Co.* 106 Wis. ——. The grant being made by the legislature, representing the sovereign power of the state, through the agency of the common council, it is certainly legislative in its character. Thus, it has been held that, "A grant of a right of way over a tract of land to a railroad company by a municipal corporation by an ordinance which provides that the company shall erect suitable fences on the line of the road, and maintain gates at street crossings, is not a mere contract, but is an exercise of the right of *municipal legislation*, and has the force of law within the corporate limits." *Hayes v. M. C. R. Co.* 111 U. S. 228. The fact that the passage and acceptance of the ordinance may result in a contract does not destroy its legislative character. *Des Moines G. Co. v. Des Moines, supra.* Thus, in a recent case, it is held in New York that "the action of the common council of Buffalo in granting consent to construct a street railroad under the revised charter of Buffalo *is a legislative*, and not an administrative, act." *Kittinger v. Buffalo T. Co.* 160 N. Y. 377.

The passage of the ordinance in question being legislative in its character, the question recurs whether the trial court, as a court of equity, had jurisdiction to restrain the common council from passing the same. The question is very important, and has received careful consideration. Our dual system of state and national governments is unique and intricate. We not only have numerous states embraced within the nation, but numerous municipalities in each state. The governmental power of each state, as well as the nation, is divided into three separate departments,— legislative, executive, and judicial,— which are in their action almost wholly independent of each other. The same three departments, in an inferior and subordinate way, exist in each municipality. In the exercise of such powers, the natural, if not the essential, order is for the legislative department, engaged in the enactment of laws, by-laws, and ordinances, to act first; for

the executive department, engaged in executing and enforc-
ing the laws, to act next; and for the judicial department,
engaged in construing and declaring the laws, to act last —
and hence the conservative agency of the government,
whether national, state, or municipal. From the very nature
of things, the judicial power cannot legislate nor supervise
the making of laws. It is equally true that the legislative
power cannot act judicially. Thus it has been held in Penn-
sylvania that the legislature has no power to order a new
trial, or to direct the court to order it, either before or after
judgment, since such power was judicial. *De Chastellux v.
Fairchild*, 15 Pa. St. 18; *S. C.* 53 Am. Dec. 570, per GIBSON,
C. J. One of the most eminent jurists, in such matters, which
this country has produced, speaking for the supreme court
of the United States, has left on record this statement: "That
department [judicial] has no will in any case. . . . Judi-
cial power, as contradistinguished from the power of the
laws, has no existence. Courts are the mere instruments of
the law, and can will nothing. When they are said to exer-
cise a discretion it is a mere legal discretion, a discretion to
be exercised in discerning the course prescribed by law; and,
when that is discerned, it is the duty of the court to follow it.
Judicial power is never exercised for the purpose of giving
effect to the will of the judge; always for the purpose of
giving effect to the will of the legislature; or, in other words,
to the will of the law." Chief Justice MARSHALL in *Osborn
v. Bank of U. S.* 9 Wheat. 866. The same chief justice wrote
the opinion of the court refusing to restrain the state of
Georgia and its several officials from enforcing an act of the
legislature of that state in conflict with a treaty between
the United States and the Cherokee Nation of Indians in
that state, and which act of the legislature was subsequently
held to be void, on the ground that such restraint was an
exercise of political power. *Cherokee Nation v. Georgia*, 5
Pet. 1; *Worcester v. Georgia*, 6 Pet. 515. See, also, *Louisiana*

*v. Texas,* 176 U. S. 1.   For the same reason that court re-
fused to restrain President Andrew Johnson from enforcing
an act of Congress alleged to be unconstitutional and void,
and in fact refused to allow the bill to be filed. *Mississippi
v. Johnson,* 4 Wall. 475.   Numerous cases might be cited
where courts have refused to take jurisdiction to control the
discretion of administrative officers.

A failure to observe the dividing line between legisla-
tive and judicial power, as indicated, may account for some
want of harmony in judicial utterances.   One of the cases
most relied upon by counsel for the defendant is *People ex
rel. Davis v. Sturtevant,* 9 N. Y. 263, punishing Sturtevant,
one of the aldermen of the city, for contempt in violating
an injunction in the case of Davis & Palmer against the
mayor and aldermen, restraining the latter from authoriz-
ing the building of a railway in Broadway, on the ground
that the same was a public nuisance.   *Id.* 269.   But it ap-
pears in the injunction suit that the mayor and common
council had no power whatever to authorize the building of
such railway, and hence were acting without any authority.
*Davis v. New York,* 14 N. Y. 506.   Of course, a common
council cannot act legislatively where it has no power to
act at all.   In *People ex rel. Negus v. Dwyer,* 90 N. Y. 402,
relied upon by counsel, the elevated railway had been incor-
porated by the legislature, to run on certain streets, or others
that might be named by the mayor and common council.
The common council passed a resolution naming certain
streets.   The mayor vetoed the same.   Thereupon the com-
mon council were restrained from passing the resolution
over the veto.   Notwithstanding, they passed it over the
veto and were punished for contempt.   The only ground
upon which that case can be justified, if at all, in our judg-
ment, is that the mere naming of such streets was not
a legislative act, but a mere ministerial act.   Later cases
in that state seem to condemn the restraining of the com-

mon council when clearly acting within its power and discretion. *Talcott v. Buffalo*, 125 N. Y. 280; *Kittinger v. Buffalo T. Co.* 160 N. Y. 377. In this last case it was held that the action of the common council in granting consent to construct a street railway was a legislative act, and that the rule that courts cannot inquire into the motives inducing legislation extends to legislative acts by a common council of a city as well as to those by a state legislature. To the same effect, *Waterloo W. Mfg. Co. v. Shanahan*, 128 N. Y. 346; *People ex rel. Bolton v. Albertson*, 55 N. Y. 54; *U. S. v. Des Moines N. & R. Co.* 142 U. S. 510; *Angle v. C., St. P., M. & O. R. Co.* 151 U. S. 3. As indicated in this last case, the court is limited to the question of power, and its inquiry does not extend to matters of expediency, the motives of the legislators, or the reasons given for their action. It has been held in New York that "the writ of *certiorari* will not issue to review a mere legislative action, although it may involve the exercise of discretion." *People ex rel. O'Connor v. Sup'rs of Queens Co.* 153 N. Y. 370. The general rule undoubtedly is, as recently held by the supreme court of the United States, that "a court of equity cannot properly interfere with, or, in advance, restrain, the discretion of a municipal body while it is in the exercise of powers that are legislative in their character." *New Orleans W. W. Co. v. New Orleans*, 164 U. S. 471, 481. To the same effect, *Chicago v. Evans*, 24 Ill. 52; *Des Moines G. Co. v. Des Moines*, 44 Iowa, 505; *Mason v. Shawneetown*, 77 Ill. 533; *Stevens v. St. Mary's Training School*, 144 Ill. 336; *Muhler v. Hedekin*, 119 Ind. 482; *Cape May & S. L. R. Co. v. Cape May*, 35 N. J. Eq. 419; *Alpers v. San Francisco*, 32 Fed. Rep. 503; *Detroit v. Wayne Circuit Judge*, 79 Mich. 384.

The exceptions to the rule would seem to be limited to cases where the governing body of the municipality has no power to act on the particular subject, legislatively, at all,

or where the threatened act is not legislative, but purely ministerial, or where such body is clothed with certain powers, but threatens to go beyond or outside of such powers, and thereby invade the property or property rights of the complainant, or where such body threatens to squander or divert some fund or property held by it or some of its officials in trust for its taxpayers and citizens. *Stevens v. St. Mary's Training School*, 144 Ill. 336; *Spring Valley Water Works v. Bartlett*, 16 Fed. Rep. 615; *Roberts v. Louisville*, 13 L. R. A. 844, 92 Ky. 95; *Murphy v. East Portland*, 42 Fed. Rep. 308; *State ex rel. Att'y Gen. v. Circuit Court*, 97 Wis. 1. But it is well settled that courts of equity will not attempt to control the discretionary or legislative powers vested by law in municipal corporations. *Stevens v. St. Mary's Training School, supra.* So, in Indiana, it has been held not to be within the jurisdiction of a court of equity to enjoin the common council of a city from investigating charges against waterworks trustees or other municipal officers, and from removing them from office. *Muhler v. Hedekin, supra.* So, in New Jersey, it has been held that "there can ordinarily be no judicial restraint or interference with municipal corporations in the *bona fide* exercise of powers legislative or discretionary in their nature, provided private rights are not violated." *Cape May & S. L. R. Co. v. Cape May*, 35 N. J. Eq. 419. So it has been held in the federal court in Oregon that "a court of equity will not enjoin a municipal corporation in the exercise of its legislative function, unless the proposed act is beyond the scope of its power, and its passage would work irreparable injury." *Murphy v. East Portland, supra.* Of course, the courts may interfere, and prevent the enforcement of an illegal ordinance after its passage. This is held in several of the cases cited.

Counsel also contend that the proposed ordinance not only grants corporate rights and franchises, but will make, when accepted, an irrevocable contract. We do not feel called

upon in this case to determine whether that is so or not. If the ordinance goes beyond, and is outside of, the authority given by the statute quoted, then to that extent it would be invalid and would hurt no one. If, on the contrary, it is within the authority so given by the legislature, and the legislation is valid, then it is not perceived upon what ground a court of equity can interfere at the suit of a private party. As already indicated, such corporate rights and franchises are not like a fund or property held in trust for the citizens and taxpayers of the city. The statute expressly authorizes the making of the grant " upon such terms as the proper authorities shall determine," and this, in the instant case, manifestly means the common council. The statute also provides that such road shall " be subject to such reasonable rules and regulations and the payment of such license fees as the proper municipal authorities may by ordinance, from time to time, prescribe." Construing that statute, this court has held that the common council may, from time to time, change the license fee to be paid by the company, notwithstanding the amount of the fee was originally fixed by the ordinance granting the franchises. *State ex rel. Cream City R. Co. v. Hilbert*, 72 Wis. 184. Of course, whatever contract is so made is subject to the conditions imposed by the statute giving the authority to make the contract. The power so vested in the common council is, within the limits prescribed, a discretionary power; and we must hold that a court of equity had no jurisdiction to restrain the common council from exercising such discretion, especially at the suit of a private party.

It is said that the amendment to the ordinance, as originally proposed, was not submitted to a committee as required. It is enough to say that a court of equity has no place in the chamber of the common council to supervise or superintend the proceedings of that body, while engaged in the exercise of legislative or discretionary functions. The common council of Milwaukee, like other legislative bodies and courts, is

liable to commit errors which may be fatal to its action; but that does not take away its power to act. Counsel for the defendant admitted upon the argument that the common council had power to pass the ordinance if it had proceeded regularly. But a court of equity has no power to prevent such action merely because the mode or manner of its procedure is irregular. To do so would be to stop the machinery of the city government. It is not a question of the propriety, or expediency, or wisdom of the proposed action, but a question of the power of the common council and the jurisdiction of the court.

*By the Court.*— The peremptory writ of prohibition is awarded.